Citation Nr: 1808270 
Decision Date: 02/08/18 Archive Date: 02/20/18

DOCKET NO. 12-15 507 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Reno, Nevada


THE ISSUES

1. Entitlement to a retroactive payment.

2. Entitlement to a rating in excess of 30 percent for traumatic arthritis of the cervical spine with herniated pulposus.

3. Entitlement to service connection for hypertension.

4. Entitlement to service connection for hypothyroidism.

5. Entitlement to service connection for heel spurs.

6. Entitlement to service connection for shoulder spurs/arthritis.

7. Entitlement to service connection for toe spurs/arthritis.




REPRESENTATION

Veteran represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

James A. DeFrank, Counsel


INTRODUCTION

The Veteran served on active duty from November 1960 to April 1982.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from May 2008 and November 2016 rating decisions by a Department of Veterans Affairs (VA) Regional Office (RO).

In October 2014, the Veteran testified before a Veterans Law Judge (VLJ) at a videoconference hearing. A copy of the transcript has been associated with the claims file. 

In February 2015 the Board remanded these issues for additional development.

In October 2017, the Board sent a letter to the Veteran informing him that the VLJ before whom he had testified in October 2014 was no longer employed at the Board and advising him that he had a right to a new hearing before another VLJ that would decide his case. See 38 U.S.C. § 7107(c) (2012) (providing that the member or members designated to conduct a hearing shall participate in making the final determination of a claim on appeal). The letter informed him that, if he did not respond in 30 days, the Board would assume he did not want another hearing. Therefore, as the Veteran did not respond to the October 2017 letter, the Board presumes that the Veteran does not wish to attend another hearing and desires a decision based on the current record.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2017). 38 U.S.C. § 7107(a)(2) (2012).

The issue of entitlement to a retroactive payment is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran's cervical spine disability has not been manifested by unfavorable ankylosis of the entire cervical spine or incapacitating episodes at any time during the period on appeal.

2. The Veteran's service-connected cervical spine disability has been manifested by mild incomplete paralysis of the ulnar nerve of the left hand.

3. The Veteran's hypothyroidism is not related to an in-service injury, disease, or event.

4. The Veteran's heel spurs are not related to an in-service injury, disease, or event.

5. The Veteran's shoulder spurs/arthritis disability was not manifest in service, was not manifest within one year of separation and is not related to service.

6. The Veteran's toe spurs/arthritis disability was not manifest in service, was not manifest within one year of separation and is not related to service.

7. The Veteran's hypertension was not manifest in service, was not manifest within one year of separation and is not otherwise related to his service.


CONCLUSIONS OF LAW

1. The criteria for a rating in excess of 30 percent for a cervical spine disability are not met. 38 C.F.R. §§ 3.321, 4.1, 4.7, 4.10, 4.40, 4.45, 4.59, 4.71a, Diagnostic Code 5242 (2017).

2. The criteria for a separate 10 percent rating, but no higher, for incomplete paralysis of the ulnar nerve of the left hand associated with service-connected cervical spine disability are met. 38 U.S.C. § 1155 (2012); 38 C.F.R. § 4.124a, Diagnostic Code 8516 (2017).

3. A hypothyroidism disability was not incurred in active military service. 38 U.S.C. §§ 1101, 5107 (2012); 38 C.F.R. § 3.303 (2017).

4. A heel spurs disability was not incurred in active military service. 38 U.S.C. §§ 1101, 5107 (2012); 38 C.F.R. § 3.303 (2017).

5. A shoulder spurs/arthritis disability was not incurred in service, and may not be presumed to have been incurred therein. 38 U.S.C. §§ 1110, 1112, 1131, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2017).

6. A toe spurs/arthritis disability was not incurred in service, and may not be presumed to have been incurred therein. 38 U.S.C. §§ 1110, 1112, 1131, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2017).

7. Hypertension was not incurred in service, and may not be presumed to have been incurred therein. 38 U.S.C. §§ 1110, 1112, 1131, 5107 (2012); 38 C.F.R. §§ 3.303, 3.307, 3.309 (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

VA's duties to notify and assist claimants in substantiating a claim for VA benefits are found at 38 U.S.C. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (2012) and 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2017). 

In a December 2017 Post-Remand Brief, the Veteran's representative argued that the VA examinations are inadequate to decide the claims. The Veteran's representative was not specific as to why the VA examinations for service connection are inadequate but argued that the examination for the Veteran's cervical spine disability examination did not account for his reports of flare-ups. The Board has reviewed the VA examinations and finds that they are adequate upon which to base a determination because the examination reports were based on physical examinations of the Veteran, and complete reviews of the claims file. Further, the examiners supported their opinions with thorough rationales. Accordingly, the Board concludes that the January 2011 and April 2017 VA examinations are adequate upon which to decide the claims.

The Veteran was not provided with a VA examination and opinion to assess the current nature and etiology of his claimed hypothyroidism. However, VA need not conduct an examination with respect to this claim on appeal, as information and evidence of record contains sufficient competent medical evidence to decide the claim. See 38 C.F.R. § 3.159(c)(4). Under McLendon v. Nicholson, 20 Vet. App. 79 (2006), VA must provide a VA medical examination when there is (1) competent evidence of a current disability or persistent or recurrent symptoms of a disability, and (2) evidence establishing that an event, injury, or disease occurred in service or establishing certain diseases manifesting during an applicable presumptive period for which the claimant qualifies, and (3) an indication that the disability or persistent or recurrent symptoms of a disability may be associated with the Veteran's service or with another service-connected disability, but (4) insufficient competent medical evidence on file for the VA to make a decision on the claim. Simply stated, and as will be discussed in detail below, the standards of McLendon are not met in this case as there is no credible lay evidence or competent medical evidence that the Veteran has a current hyperthyroidism disability that is related to service due to confirmed radiation exposure. Thus remand for a VA examination is not necessary. 

The Veteran and his representative have not raised any additional issues with the duty to notify or duty to assist with regard to the claims decided below. See Scott v McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015) (holding that "the Board's obligation to read filings in a liberal manner does not require the Board . . . to search the record and address procedural arguments when the veteran fails to raise them before the Board."); Dickens v. McDonald, 814 F.3d 1359, 1361 (Fed. Cir. 2016) (applying Scott to duty to assist argument).

I. Increased Rating

Laws and Regulations

The Board must assess the credibility and weight of all evidence, including the medical evidence, to determine its probative value, accounting for evidence which it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. Equal weight is not accorded to each piece of evidence contained in the record; every item of evidence does not have the same probative value. When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claims or is in relative equipoise, with the Veteran prevailing in either event, or whether a preponderance of the evidence is against the claims, in which case, the claims are denied. See Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

Disability evaluations are determined by evaluating the extent to which a Veteran's service-connected disability adversely affects his or her ability to function under the ordinary conditions of daily life, including employment, by comparing his or her symptomatology with the criteria set forth in the Schedule for Rating Disabilities. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and the residual conditions in civilian occupations. Generally, the degree of disabilities specified are considered adequate to compensate for considerable loss of working time from exacerbation or illness proportionate to the severity of the several grades of disability. 38 U.S.C. § 1155; 38 C.F.R. § 4.1 (2017). Separate diagnostic codes identify the various disabilities and the criteria for specific ratings. If two disability evaluations are potentially applicable, the higher evaluation will be assigned to the disability picture that more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2017). Any reasonable doubt regarding the degree of disability will be resolved in favor of the Veteran. 38 C.F.R. § 4.3 (2017). 

The Veteran's entire history is reviewed when making a disability determination. See 38 C.F.R. § 4.1 (2017). Where service connection has already been established, and increase in the disability rating is at issue, it is the present level of the disability that is of primary concern. See Francisco v. Brown, 7 Vet. App. 55 (1994). However, in Fenderson v. West, 12 Vet. App. 119 (1999), it was held that evidence to be considered in the appeal of an initial assignment of a disability rating was not limited to that reflecting the then current severity of the disorder. The Court also discussed the concept of the "staging" of ratings, finding that, in cases where an initially assigned disability evaluation has been disagreed with, it was possible for a veteran to be awarded separate percentage evaluations for separate periods based on the facts found during the appeal period. See also Hart v. Mansfield, 21 Vet. App. 505 (2008).

The evaluation of the same disability under various diagnoses, known as pyramiding, is generally to be avoided. 38 C.F.R. § 4.14 (2017). The critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the disabilities is duplicative or overlapping with the symptomatology of the other disability. See Esteban v. Brown, 6 Vet. App. 259, 261- 62 (1994).

Where there is a question as to which of two ratings shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. §4.7 (2017).

In this case, the Veteran is competent to testify on factual matters of which he has first-hand knowledge. Washington v. Nicholson, 19 Vet. App. 362 (2005). He is also competent to report symptoms of his cervical spine disability. Layno v. Brown, 6 Vet. App. 465, 469-71 (1994). The Veteran is competent to describe his symptoms and their effects on employment or daily activities. His statements have been consistent with the medical evidence of record, and are probative for resolving the matter on appeal.

The Board will consider not only the criteria of the currently assigned diagnostic codes, but also the criteria of other potentially applicable diagnostic codes.

The Veteran filed a claim for an increased rating for his service-connected cervical spine disability which was received by VA in February 2007.

The Veteran currently has a 30 percent rating for traumatic arthritis of the cervical spine with herniated pulposus under Diagnostic Codes 5010-5242.

Under the applicable criteria, the General Rating Formula for Diseases and Injuries of the Spine provides that a 30 percent rating is assignable for forward flexion of the cervical spine 15 degrees or less; or, favorable ankylosis of the entire cervical spine. A 40 percent rating is assignable for unfavorable ankylosis of the entire cervical spine. A 100 percent rating is assignable for unfavorable ankylosis of the entire spine. 

Ankylosis is the immobility and consolidation of a joint due to disease, injury or surgical procedure. See Lewis v. Derwinski, 3 Vet. App. 259 (1992) [citing Saunders Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health at 68 (4th ed. 1987)]. 

The rating criteria define normal range of motion for the various spinal segments for VA compensation purposes. Normal forward flexion of the cervical spine is zero to 45 degrees, extension is zero to 45 degrees, left and right lateral flexion is zero to 45 degrees, and left and right lateral rotation is zero to 80 degrees. The normal combined range of motion of the cervical spine is 340 degrees. The normal ranges of motion for each component of spinal motion provided in this note are the maximum that can be used for calculation of the combined range of motion. See 38 C.F.R. § 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Note (2), as added by 68 Fed. Reg. 51,454 (Aug. 27, 2003).

Also, the current schedular rating criteria instructs to evaluate intervertebral disc syndrome (IVDS or degenerative disc disease) either under the general rating formula for diseases and injuries of the spine or under the formula for rating IVDS based on incapacitating episodes, whichever method results in the higher evaluation. The Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes (in pertinent part): a 20 percent disability rating is warranted with incapacitating episodes having a total duration of at least 2 weeks but less than 4 weeks during the past 12 months; a 40 percent disability rating is warranted with incapacitating episodes having a total duration of at least 4 weeks but less than 6 weeks during the past 12 months; and a 60 percent disability rating is warranted with incapacitating episodes having a total duration of at least 6 weeks during the past 12 months. 

Note (1): For purposes of evaluations under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes, an incapacitating episode is a period of acute signs and symptoms due to IVDS that requires bed rest prescribed by a physician and treatment by a physician. 

The evaluation criteria are meant to encompass and take into account the presence of pain, stiffness, or aching, which are generally present when there is a disability of the spine. Therefore, an evaluation based on pain alone would not be appropriate, unless there is specific nerve root pain, for example, that could be evaluated under the neurologic sections of the rating schedule. See 68 Fed. Reg. 51, 455 (Aug. 27, 2003). 

Factual Background and Analysis

A January 2007 VA treatment report noted that the Veteran's neck was supple with no synovitis and full range of motion with good strength.
A March 2010 VA treatment report noted "very limited" range of motion of the neck in all directions.

The Veteran underwent a VA examination in January 2011. The Veteran reported having moderate pain that was exacerbated by physical activities and relieved by rest. At the time of pain, he could function with medication. During the flare-ups he experienced functional impairment which was described as limited with head turning, prolonged driving and activities. He also had to sometimes stop his activities during a neck spasm. He reported having never been hospitalized and undergoing no surgeries for his cervical spine disability. Additionally, there were no reported episodes of incapacitation. 

On examination, his posture and gait were within normal limits. There was no evidence of radiating pain on movement, no muscle spasm, no tenderness, no weakness, no loss of tone and no atrophy of the limbs. The examination showed evidence of guarding described as slow motion in the cervical spine. There was no ankylosis of the cervical spine. Flexion was from 0 to 11 degrees. Extension was from 0 to 18 degrees. Right lateral flexion was from 0 to 20 degrees. Left lateral flexion was from 0 to 18 degrees. Right rotation was from 0 to 45 degrees. Left lateral flexion was from 0 to 30 degrees. There was no additional limitation in movement after repetitive use. The examiner noted that the function of the spine was not additionally limited by pain, fatigue, weakness, lack of endurance or incoordination after repetitive use. The inspection of the spine revealed normal head position with symmetry in appearance. 

The neurological examination revealed that cervical spine sensory function was impaired. The examination revealed no motor weakness but there was a sensory deficit of the left ulnar side of the ring finger and left little finger. The left upper extremity reflexes reveal normal biceps jerk and triceps jerk. The upper extremities showed no signs of pathologic reflexes and there were normal cutaneous reflexes. There were signs of cervical intervertebral disc syndrome. The most likely peripheral nerve was the ulnar nerve. The diagnosis was cervical spine traumatic arthritis with herniated pulposus, cervical spine intervertebral disc syndrome involving the left ulnar nerve. The objective factors were cervical spine limited range in motion and decreased sensation in the left fingers.

An April 2013 treatment note reported that the Veteran had no neck symptoms. 
A May 2014 treatment report from O'Callaghan Federal Hospital at Nellis Air Force Base noted that the Veteran's appearance of the neck was normal and that there was no tenderness of the neck.

The Board finds that the criteria for a rating in excess of 30 percent for a traumatic arthritis of the cervical spine with herniated pulposus disability have not been met at any time during the claim.

As noted above, to warrant a rating in excess of 30 percent under the General Rating Formula for Diseases and Injuries of the Spine, the evidence must show unfavorable ankylosis of the entire cervical spine. The Veteran has never reported suffering ankylosis in his cervical spine, and there is no medical evidence of record showing ankylosis. The January 2011 VA examination indicated that there was no ankylosis and the most recent treatment records relating to the cervical spine demonstrate that the Veteran still has motion of the spine. Accordingly, a 40 percent disability rating is not warranted under the General Ratings Formula. See 38 C.F.R. § 4.71a, Diagnostic Code 5235-5243 (2017).

While the Veteran's cervical degenerative disc disease may, in the alternative, be termed intervertebral disc syndrome, there have been no reports of any incapacitating episodes. As noted above, the January 2011 VA examiner specifically noted that there have been no incapacitating episodes due to the cervical intervertebral disc syndrome. Accordingly, the Board finds the Veteran is not entitled to a rating in excess of 30 percent based on incapacitating episodes.

Further, there is no evidence to support a higher disability rating for the cervical spine disability based on consideration of limitation of motion or with functional loss, as the Veteran has not exhibited a sufficient degree of limited flexion or extension, even when accounting for the factors of functional loss. 38 C.F.R. §§ 4.40, 4.45; DeLuca, 8 Vet. App. at 206. 
The Board accepts that the Veteran has experienced functional impairment and pain. However, neither the lay nor medical evidence reflects the functional equivalent of limitation of motion (or total lack thereof, as evidenced by ankylosis) nor the functional equivalent of symptomatology required to warrant the next higher evaluation. 

Notably, on the January 2011 VA examination, the Veteran reported flare-ups of pain where he experienced functional impairment which was described as limited with head turning, prolonged driving and activities. He also had to sometimes stop his activities during a neck spasm. However, it was also noted that at the time of pain, the Veteran could function with medication. The examiner also noted that the function of the spine was not additionally limited by pain, fatigue, weakness, lack of endurance or incoordination after repetitive use. 

Therefore, even with the reports of flare-ups, the Board finds that the overall impairment resulting from his cervical spine disability still more nearly approximates no more than a 30 percent rating as again, even during flare-ups there is no indication that the Veteran did not have motion of the spine.

The Board finds that the 30 percent evaluation assigned for the cervical spine adequately portrays any functional impairment, pain, and weakness that the Veteran experiences as a consequence of use of his cervical disability. Thus, a higher evaluation based on functional loss is not warranted. See DeLuca, supra.

Moreover, as noted in VAOPGCPREC 36-97, and Johnston v. Brown, 10 Vet. App. 80, 84-85 (1997), the Veteran's 30 percent rating represents the maximum rating available for his cervical spinal disability that contemplates a loss of motion aside from ankylosis. Accordingly, consideration for additional disability under the above regulations is not required.

As the preponderance of the evidence is against the claim for a rating in excess of 30 percent for the service-connected traumatic arthritis of the cervical spine with herniated pulposus disability the benefit-of-the-doubt rule does not apply, and the claim must be denied. 38 U.S.C. § 5107(b) (2012); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

However, while a rating in excess of 30 percent is not warranted for traumatic arthritis of the cervical spine with herniated pulposus, the Board finds that a separate 10 percent rating is warranted for mild incomplete paralysis of the left ulnar nerve associated with service-connected cervical spine disability. As noted above, the January 2011 VA examiner indicated that the Veteran's cervical spine sensory function was impaired as there was a sensory deficit of the left ulnar side of the ring finger and left little finger. Accordingly, a separate rating is warranted for neurological symptoms associated with the Veteran's service-connected cervical spine disability.

Under Diagnostic Code 8516, for the major arm, mild incomplete paralysis of the ulnar nerve is rated as 10 percent disabling; moderate incomplete paralysis is rated as 30 percent disabling; and severe incomplete paralysis is rated as 40 percent disabling. Complete paralysis of the ulnar nerve warrants a 60 percent evaluation; with the "griffin claw" deformity, due to flexor contraction of ring and little fingers, atrophy very marked in dorsal interspace and thenar and hypothenar eminences; loss of extension of ring and little fingers cannot spread the fingers (or reverse), cannot adduct the thumb flexion of wrist weakened. 38 C.F.R. § 4.124a.

Under Diagnostic Code 8516, for the minor arm, mild incomplete paralysis of the ulnar nerve is rated as 10 percent disabling; moderate incomplete paralysis is rated as 20 percent disabling; and severe incomplete paralysis is rated as 30 percent disabling. Complete paralysis of the ulnar nerve warrants a 50 percent evaluation. 38 C.F.R. § 4.124a.

The term "incomplete paralysis" with peripheral nerve injuries indicates a degree of loss or impaired function substantially less than the type pictured for complete paralysis given with each nerve, whether due to the varied level of the nerve lesion or to partial regeneration. When the involvement is wholly sensory, the rating should be for mild, or at most, the moderate degree. See 38 C.F.R. § 4.124a, Note.

In this instance, the January 2011 VA examiner specifically indicated that the Veteran's cervical spine sensory function was impaired as there was a sensory deficit of the left ulnar side of the ring finger and left little finger. The examination however also revealed no motor weakness, normal left upper extremity reflexes, normal cutaneous reflexes and no signs of pathologic reflexes. The Board finds that this corresponds to a 10 percent rating under Diagnostic Code 8516 for mild incomplete paralysis of the left ulnar nerve. 

The medical evidence does not establish moderate or severe incomplete paralysis of the left ulnar nerve as there is no medical evidence which characterizes the left ulnar nerve incomplete paralysis as moderate or severe.

Accordingly, as these finding correspond to mild incomplete paralysis of the left ulnar nerve, which warrants a 10 percent evaluation, a separate 10 percent rating is warranted for the Veteran's neurological symptoms related to his service-connected cervical spine disability.

II. Service Connection

Laws and Regulations

The Veteran has asserted that he was exposed to ionizing radiation during service, as part of his duties with the 55th Weather Reconnaissance Squadron from 1965 to 1967, and that this has resulted in his bone spur disabilities and hypothyroidism. The Veteran has stated, and has submitted internet articles purporting to show, that the unit's primary mission was to conduct particulate and gaseous atmospheric sampling by flying aircraft through nuclear test sites, and that he was exposed to radiation when he conducted maintenance on the aircraft when they landed in McClellan Air Force Base immediately after flying on their sampling missions. A chronological listing of service in the Veteran's service treatment records documents that he served as a flight line mechanic with the 55th Weather Reconnaissance Squadron from May 1965 to June 1966, and as an aircraft maintenance technician with the same squadron from June 1966 to April 1967.

Service connection will be granted if the evidence demonstrates that a current disability resulted from an injury or disease incurred in or aggravated by active military service. 38 U.S.C. § 1131; 38 C.F.R. § 3.303(a).

To establish a right to compensation for a present disability, a Veteran must show: "(1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service." Davidson v. Shinseki, 581 F.3d 1313, 1315-16 (Fed. Cir. 2009); Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Certain diseases, to include arthritis and hypertension, may be presumed to have been incurred in service when manifest to a compensable degree within one year of discharge from active duty. 38 U.S.C. § 1112 (2012); 38 C.F.R. §§ 3.307, 3.309 (2017). 

Under 38 C.F.R. § 3.303(b), an alternative method of establishing the second and third Shedden for certain chronic disabilities such as arthritis is through a demonstration of continuity of symptomatology. 

Service connection for disability that is claimed to be attributable to exposure to ionizing radiation during service can be demonstrated by three different methods. See Davis v. Brown, 10 Vet. App. 209, 211 (1997); Rucker v. Brown, 10 Vet. App. 67, 71 (1997). First, there are certain types of cancer that are presumptively service connected specific to radiation-exposed veterans. 38 U.S.C. § 1112(c); 38 C.F.R. § 3.309(d). Second, "radiogenic diseases" may be service connected pursuant to 38 C.F.R. § 3.311. Third, service connection may be granted under 38 C.F.R. § 3.303(d) when it is established that the disease diagnosed after discharge is the result of exposure to ionizing radiation during active service. Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994).

First, diseases specific to radiation-exposed veterans are the following: leukemia (other than chronic lymphocytic leukemia), thyroid cancer, breast cancer, cancer of the pharynx, esophageal cancer, stomach cancer, cancer of the small intestine, pancreatic cancer, multiple myeloma; lymphomas (except Hodgkin's disease), cancer of the bile ducts, cancer of the gall bladder, primary liver cancer (except if cirrhosis or hepatitis B is indicated), salivary gland cancer, cancer of the urinary tract, bronchio-alveolar carcinoma, bone cancer, brain cancer, colon cancer, lung cancer, and ovarian cancer. 38 C.F.R. § 3.309(d)(2). Second, 38 C.F.R. § 3.311 provides instruction on the development of claims based on exposure to ionizing radiation. Section 3.311(a) calls for the development of a dose assessment where it is established that a radiogenic disease first became manifest after service, where it was not manifest to a compensable degree within any applicable presumptive period specified in either § 3.307 or § 3.309, and where it is contended that the disease is a result of ionizing radiation in service.

In all other claims involving radiation exposure, a request will be made for any available records concerning the veteran's exposure to radiation. These records normally include but may not be limited to the veteran's Record of Occupational Exposure to Ionizing Radiation (DD Form 1141), if maintained, service medical records, and other records which may contain information pertaining to the veteran's radiation dose in service. All such records will be forwarded to the Under Secretary for Health, who will be responsible for preparation of a dose estimate, to the extent feasible, based on available methodologies. 38 C.F.R. § 3.311(a)(2) (iii).

Third, and notwithstanding the above, when a veteran is found not to be entitled to a regulatory presumption of service connection for a given disability, the claim must nevertheless be reviewed to determine whether service connection can be established on a direct basis. See Combee, 34 F.3d at 1043-1044. Thus, the Board must not only determine whether the Veteran has a disability which is recognized by VA as being etiologically related to exposure to ionizing radiation, but must also determine whether his disability is otherwise the result of active service.

In relevant part, 38 U.S.C. § 1154(a) requires that the VA give "due consideration" to "all pertinent medical and lay evidence" in evaluating a claim to disability or death benefits. Lay evidence can be competent and sufficient to establish a diagnosis of a condition when (1) a layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical professional." Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). 

Once evidence is determined to be competent, the Board must determine whether such evidence is also credible. See Layno, supra (distinguishing between competency ("a legal concept determining whether testimony may be heard and considered") and credibility ("a factual determination going to the probative value of the evidence to be made after the evidence has been admitted"). 

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the VA shall give the benefit of the doubt to the claimant. 38 U.S.C. § 5107(b).

Factual Background and Analysis

Initially, in this case, the Veteran is not considered to be a "radiation exposed" as he did not participate in a radiation risk activity as defined by 38 C.F.R. § 3.309(d)(3). He is also not shown to have a radiogenic disease as defined by 38 C.F.R. 
§ 3.309(d)(2). Thus, service connection is not warranted under these presumptive provisions. 

Service connection is also not warranted under 38 C.F.R. § 3.311 for claims based on exposure to ionizing radiation. The Veteran does not have a radiogenic disease, thus a dose estimate is not required. 

Additionally, the Department of the Air Force queried the Veteran's name in the USAF Master Radiation Exposure Registry (MRER) for records of occupational radiation exposure monitoring. However, as indicated in a July 2016 correspondence from the Air Force, they were unable to find any external or internal exposure data for the Veteran. The MRER is a single repository for occupational radiation monitoring for all Air Force personnel. Even though the records dated back to 1947, there appeared to have been cases where early records, especially the DD Form 1141, had been maintained in the military medical record or by the local unit, and had not been forwarded for inclusion in the central repository. However, the Board notes that despite its inquiries, it has not received and the Veteran has not identified any such records. Moreover, the Veteran's DD Form 1141 was not located in his service personnel records.
As a result, the preponderance of the evidence also reflects that the Veteran was not exposed to ionizing radiation during service; thus, the provisions of 38 C.F.R. 
§ 3.311 are again not applicable in this case. 

While none of the provisions relevant to exposure to radiation are applicable in this case, the Board must also determine whether the Veteran's claimed conditions are shown to be related to service. See Combee, 34 F.3d at 1043. 

A. Hypothyroidism

When considering the pertinent evidence of record in light of the above-noted legal authority, the Board finds that service connection for hypothyroidism is not warranted.

As there is a current diagnosis of hypothyroidism, the first element of service connection is satisfied. However, a veteran seeking disability benefits must establish not only the existence of a disability, but also an etiological connection between his military service and the disability. Boyer v. West, 210 F.3d 1351, 1353 (Fed. Cir. 2000); D'Amico v. West, 209 F.3d 1322, 1326 (Fed. Cir. 2000); Hibbard v. West, 13 Vet. App. 546, 548 (2000).

Notably, in a December 2001 correspondence, a private physician indicated that the Veteran described exposure to radiation on a contaminated aircraft during his military service and that this "may have led to his current thyroid dysfunction."

While the private physician seemingly offered a positive nexus opinion regarding the relationship between the Veteran's hypothyroidism and his service, the Board again notes that it has been determined that the Veteran was not exposed to ionizing radiation during service, and the provisions of 38 C.F.R. § 3.311 are again not applicable in this case.
As a result, the Board finds that the December 2001 physician's opinion that the Veteran's reported radiation exposure "may have led" to his current thyroid disability is not probative. A medical opinion based on an inaccurate factual premise is not probative. See Kowalski v. Nicholson, 19 Vet. App. 171, 179 (2005) (holding that the Board may reject a medical opinion that is based on facts provided by the veteran that have been found to be inaccurate or that are contradicted by other facts of record).

Regarding service connection on a direct basis, the Veteran's service treatment records are negative for treatments, complaints or diagnoses related to a hypothyroidism disability.

Further, there is no competent evidence or opinion otherwise suggesting that there exists a nexus between a current hypothyroidism disability and the Veteran's service on a direct basis, and neither the Veteran nor his representative have presented or identified any such existing medical evidence or opinion. 

The Board notes the Veteran's contentions regarding the etiology of his claimed hypothyroidism. To the extent that the Veteran himself contends that a medical relationship exists between his hypothyroidism and service, the Board finds that the Veteran and his representative do not have the medical expertise to provide an opinion regarding the etiology of hypothyroidism. Specifically, where the determinative issue is one of medical causation, only those with specialized medical knowledge, training, or experience are competent to provide evidence on the issue. See Jones v. West, 12 Vet. App. 460, 465 (1999). Accordingly, the Board affords the Veteran's assertions regarding the etiology of his claimed disability little probative weight. 

Consequently, entitlement to service connection for a hypothyroidism disability is also not warranted on a direct basis.

For these reasons, the Board finds that a preponderance of the evidence is against the claim for service connection for hypothyroidism, and the claim must be denied. 

B. Heel, Shoulder and Toe Spurs

The Veteran's service treatment records are negative for treatments, complaints or diagnoses related to heel spurs, shoulder spurs and toe spurs disabilities. Notably, the Veteran's January 1982 separation examination was normal concerning his heels, shoulder and toes.

Per the February 2015 Board remand, the Veteran underwent VA examinations in April 2017.

Regarding the Veteran's heel and toe spurs, the examiner noted that the Veteran had bilateral calcaneal spurs and arthritis of the right great toe. The Veteran's toe spurs were diagnosed in 1997 and 1999 and his arthritis of the right great toe was diagnosed in 1996. The examiner noted that the Veteran reported developing foot pain in the 1980s. The examiner also indicated that the Veteran's x-rays confirmed the presence of bilateral heel and toe spurs. Regarding his shoulder spurs, the examiner noted that the Veteran had left shoulder spurs, left shoulder impingement syndrome and arthritis of the right shoulder. The left shoulder disabilities were diagnosed in 1995 while the Veteran's arthritis of the right shoulder was diagnosed in December 2001. 

The examiner opined that the Veteran's left shoulder spurs were less likely than not related to the Veteran's service as the Veteran's service treatment records were silent for left shoulder pain or other problems. The examiner noted that the Veteran on his January 1982 separation examination specifically indicated that he did not have shoulder problems and a September 1995 treatment record reported that the Veteran had experienced shoulder problems one year before which indicated that the condition began around 1994 which was some 12 years after the Veteran's separation from service. 

For the Veteran's claimed bilateral heel spurs, the examiner opined that the Veteran's bilateral heel spurs were less likely than not related to the Veteran's service as the Veteran's service treatment records were silent for any type of right or left foot pain or other problems. The examiner noted that the Veteran on his January 1982 separation examination specifically indicated that he did not have foot problems and subsequent treatment records indicate that his bilateral heel pain/spurs began some time around 1996. 

For the Veteran's claimed bilateral toe spurs, the examiner opined that the Veteran's bilateral toe spurs were less likely than not related to the Veteran's service as the Veteran's service treatment records were silent for any type of right or left foot pain or other problems. The examiner noted that the Veteran on his January 1982 separation examination specifically indicated that he did not have foot problems and subsequent treatment records indicate that his right toe arthritis began around 1996.

When considering the pertinent evidence of record in light of the above-noted legal authority, the Board finds that service connection for heel spurs, shoulder spurs and toe spurs disabilities is not warranted.

As there is a current diagnosis of heel spurs, shoulder spurs and toe spurs, the first element of service connection is satisfied. However, a veteran seeking disability benefits must establish not only the existence of a disability, but also an etiological connection between his military service and the disability. Boyer v. West, 210 F.3d 1351, 1353 (Fed. Cir. 2000); D'Amico v. West, 209 F.3d 1322, 1326 (Fed. Cir. 2000); Hibbard v. West, 13 Vet. App. 546, 548 (2000).

Regarding the Veteran's claims for toe spurs and shoulder spurs, the Board notes that the April 2017 VA examination demonstrated that the Veteran has a diagnosis of arthritis of the right great toe and arthritis of the right shoulder. As noted above, service connection may be granted on a presumptive basis for certain chronic diseases, including arthritis, if such disease is shown to be manifest to a degree of 10 percent or more within one year following the Veteran's separation from active military service. See 38 U.S.C. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307, 3.309. In this instance however, service connection for arthritis of the toe and arthritis of the right shoulder on a presumptive basis is not warranted as the record does not show evidence of arthritis of the toe or shoulder during the Veteran's period of active military service, or within one year of his separation from active duty. Notably, the first evidence of any toe related complaints was in 1996, 14 years after his separation from active duty while the first evidence of any shoulder problems was in 1994 which was 12 years after his active duty. Accordingly, service connection for a toe and shoulder disability on a presumptive basis is not warranted as a chronic disease did not manifest to a degree of 10 percent or more within one year following the Veteran's separation from active military service.

To any extent that the Veteran is asserting that he experienced continuing symptoms of a toe or shoulder disability thereafter, the Board acknowledges that a layperson is competent to testify in regard to the onset and continuity of symptomatology. Heuer v. Brown, 7 Vet. App. 379, 384 (1995); Falzone v. Brown, 8 Vet. App. 398, 403 (1995); Caldwell v. Derwinski, 1 Vet. App. 466 (1991). Furthermore, lay witnesses may, in some circumstances, opine on questions of diagnosis and etiology. See Davidson v. Shinseki, 581 F.3d 1313, 1316 (Fed. Cir. 2009) (finding that the Board's categorical statement that "a valid medical opinion" was required to establish nexus, and that a layperson was "not competent" to provide testimony as to nexus because she was a layperson, conflicts with Jandreau). 

However, the Board finds it significant that on VA examination in April 2017, the Veteran reported that he had foot pain beginning in the 1980s while treatment records demonstrated that the Veteran first presented with shoulder pain around 1994. 

As the Veteran was not diagnosed with a toe or shoulder disability until many years after service and there was a significant period between his service and his post-service complaints where the medical record was silent for complaints of a toe or shoulder disability, the Board concludes that the weight of the evidence is against a finding of any continuity of symptomatology. See Maxson v. Gober, 230 F.3d 1330, 1333 (Fed. Cir. 2000); Shaw v. Principi, 3 Vet. App. 365 (1992). 

Regarding service connection on a direct basis, the Board finds that the weight of the evidence is against a finding that the Veteran's current heel spurs, shoulder spurs and toe spurs disabilities are etiologically related to the Veteran's military service. In fact, the only medical opinion addressing the etiology of the disability weighs against the claim as the April 2017 VA examiner concluded that it was less likely than not that the Veteran's current heel spurs, shoulder spurs and toe spurs were incurred in or caused by the claimed in-service injury, event or illness. 

None of the competent medical evidence currently of record refutes this conclusion, and the Veteran has not presented any such existing medical evidence or opinion. 

The Board again notes the Veteran's contentions regarding the etiology of his claimed heel spurs, shoulder spurs and toe spurs disabilities. To the extent that the Veteran himself contends that a medical relationship exists between his claimed current disabilities and service, the Board finds that the Veteran and his representative do not have the medical expertise to provide an opinion regarding the heel spurs, shoulder spurs and toe spurs etiologies. Specifically, where the determinative issue is one of medical causation, only those with specialized medical knowledge, training, or experience are competent to provide evidence on the issue. See Jones v. West, 12 Vet. App. 460, 465 (1999). Accordingly, the Board affords the Veteran's assertions regarding the etiology of his claimed disabilities little probative weight. 

In sum, the Board finds that service connection for heel spurs, shoulder spurs and toe spurs disabilities must be denied. In reaching this conclusion, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, as the preponderance of the evidence is against the claim, that doctrine is not applicable. See 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990). 

C. Hypertension

Regarding the Veteran's claim for hypertension, the Board notes that regulations provide that hypertension for VA purposes means that the diastolic blood pressure is predominantly 90 or more or systolic blood pressure is predominantly 160 or more. Hypertension must be confirmed by readings taken two or more times on three different days. 38 C.F.R. § 4.104, Diagnostic Code 7101, Note (1).

Secondary service connection will be granted when a disability is proximately due to or the result of a service connected disease or injury. 38 C.F.R. § 3.310. Secondary service connection may be established for a disorder which is aggravated by a service-connected disability. Allen v. Brown, 7 Vet. App. 439 (1995).

The Veteran's service treatment records include a number of blood pressure readings demonstrating elevated blood pressure and a November 1977 service treatment record indicated that the Veteran underwent a 2-day blood pressure check. Specifically, a November 1977 service treatment record noted a blood pressure reading of 120/90, a January 1980 service treatment record noted a blood pressure reading of 144/94, a February 1981 service treatment record noted a blood pressure reading of 132/98 and another February 1981 service treatment record noted a blood pressure reading of 130/96. However, the Veteran was not diagnosed with hypertension during service. 

Per the February 2015 Board remand instructions, the Veteran underwent a VA examination in April 2017. The examiner opined that it was less likely than not that the Veteran's hypertension was due to service as the Veteran's service treatment records did not show hypertension being present. The examiner noted that for a diagnosis of hypertension to be present, there had to be blood pressure readings above at least 140/90 taken on at least 3 different days within 30 days and the Veteran's service treatment records did not show this as having occurred. The examiner also noted that the Veteran was not started on blood pressure medication until September 1992, which is approximately ten years after his separation from service. The examiner specifically noted that on his retirement physical in January 1982, his blood pressure was not elevated at 126/86 and there was no indication of hypertension. He also had a blood pressure on December 1988 which was normal.

Further, the examiner opined that it was less likely as not that his hypertension was cuased or aggravated by a service-connected disability. The Veteran's service-connected disabilities are not known risk factors for hypertension. The examiner added that as the Veteran's service-connected disabiliites are not known risk factors, they do not aggravte his hypertension either. Instead, his hypertension is at least as likely as not essential hypertension which is defined as hypertension due to no other known etiology. The examiner cncluded that aproximately 90 to 95 percent of cases of hypertension within the general public are classified as essential, as is likley the case with the Veteran.

The Board affords this examination and examiner's conclusions great probative value, as they were based on a thorough review of the claims file and contain a complete rationale for the conclusions reached.

The Board observes the Veteran's contention that his hypertension is etiologically related to his military service, however, he has not been shown to be competent to opine as to etiology.

In summary, the prepondernce of the evidence reflects that the Veteran's hypertension began approximately ten years after his separation from service. The preponderance of the evidence does not otherwise reflect an etiological relationship to his military srevice. Accordingly, service connection for hypertension is denied.


ORDER

Entitlement to a rating in excess of 30 percent for traumatic arthritis of the cervical spine with herniated pulposus is denied.

Entitlement to a separate 10 percent disability rating for mild incomplete paralysis of the left ulnar nerve is granted.
Entitlement to service connection for hypothyroidism is denied.

Entitlement to service connection for heel spurs is denied.

Entitlement to service connection for shoulder spurs/arthritis is denied.

Entitlement to service connection for toe spurs/arthritis is denied.

Entitlement to service connection for hypertension is denied.
REMAND

The Board finds that more development is necessary prior to final adjudication of the claim remaining on appeal.

Notably, in a November 2016 decision, the RO found that after an audit, the Veteran's account with VA was balanced.

In February 2017, the Veteran filed a notice of disagreement (NOD) as to the November 2016 rating decision regarding entitlement to a retroactive payment.

As a result, while the Veteran expressed disagreement with the November 2016 rating decision, it appears that no subsequent statement of the case was ever issued. Under Manlincon v. West, 12 Vet. App. 238, 240 (1999), the Board must instruct the RO that the issue of entitlement to a retroactive payment remains pending in appellate status and requires further action. See 38 U.S.C. § 7105; 38 C.F.R. § 19.26. In this regard, it is noteworthy that this claim is not before the Board at this time and will only be before the Board if the Veteran files a timely substantive appeal. The Board's actions regarding this issue are taken to fulfill the requirements of the Court in Manlincon. 

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

The RO should issue a statement of the case to the Veteran addressing the matter of entitlement to a retroactive payment, including citation to all relevant law and regulation pertinent to this claim. The Veteran must be advised of the time limit for filing a substantive appeal. 38 C.F.R. § 20.302(b). Then, only if the appeal is timely perfected, this issue is to be returned to the Board for further appellate consideration, if otherwise in order.

The Veteran has the right to submit additional evidence and argument on the matter the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).






______________________________________________
S. HENEKS
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs